```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT

WATERBURY HOSPITAL CENTER,      :
ET AL.,                         :
                                :
     Plaintiffs,                :
                                :   CASE NO. 3:09-CV-1701(RNC)
V.                              :
                                :
KATHLEEN G. SEBELIUS,            :
                                :
     Defendant.
```
RULING AND ORDER

This case concerns the amount of Medicare reimbursement the plaintiffs should receive for serving a disproportionate share of low-income patients.  Plaintiffs are four Connecticut hospitals that accept Medicare and Medicaid patients: Waterbury Hospital Center ("Waterbury Hospital"), Middlesex Hospital, The William W. Backus Hospital ("Backus Hospital"), and Danbury Hospital.[1]  They bring this action under 42 U.S.C. § 1395oo(f) seeking judicial review of a final Medicare reimbursement decision by the Secretary of the Department of Health and Human Services ("the Secretary").  The Secretary decided that the plaintiffs are not entitled to include in the calculation of their Medicare Disproportionate Share Hospital ("DSH") adjustment for the years at issue (1995-1998) patient days for patients covered by Connecticut's State Administered General Assistance program

---

[1] A fifth hospital, St. Vincent's Medical Center ("St. Vincent's"), has withdrawn its claims.

1

("SAGA"), which provides medical assistance to uninsured low-income patients not eligible for other medical assistance programs, including Medicaid.  The Secretary concluded that the Medicare statute allows a DSH adjustment only for patient days attributable to individuals eligible for Medicaid.  Both sides have moved for summary judgment.  In cases involving similar challenges by Medicare-participating hospitals to the Secretary's interpretation of the Medicare statute's formula for providing DSH reimbursements, courts of appeals have affirmed decisions granting summary judgment against the hospitals and in favor of the Secretary.  See Adena Reg'l Med. Ctr. V. Leavitt, 527 F.3d 176 (D.C. Cir. 2008); Univ. Of Wash. Med. Ctr. V. Sibelius, 634 F.3d 1029 (9th Cir. 2011); Cooper Univ. Hosp. v. Sibelius, 636 F.3d 44 (3d Cir. 2010).  I agree with these courts that the Secretary's legal position is correct and therefore grant the defendant's motion for summary judgment and deny the plaintiffs' cross-motion.

I. Background

Medicare is a federally funded health insurance program designed to provide assistance to the elderly and disabled.  See 42 U.S.C. §§ 1395-1395cc.  Part A of the Medicare statute provides for payments to participating hospitals for inpatient services.  See 42 U.S.C. § 1395d(a)(1).  These payments are determined by fiscal intermediaries, known as medicare

administrative contractors ("MACs"), which contract with the Secretary.  See 42 U.S.C. § 1395h, 42 C.F.R. §§ 413.20 and 413.24.  At the end of each fiscal year, hospitals prepare cost reports and request payments; the MACs analyze the reports and issue each hospital a Notice of Program Reimbursement ("NPR").  See 42 C.F.R. § 405.1803.  A hospital may appeal the NPR determination to the Provider Reimbursement Review Board ("PRRB"), an administrative body appointed by the Secretary.  See 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835-1837.  The Board's final decision is subject to review by the Administrator of the Centers for Medicare and Medicaid Services (CMS), whose decision becomes the final decision of the Secretary.

Medicare reimburses hospitals through a prospective payment system ("PPS") based on what it would cost an efficient hospital to treat a patient with a given diagnosis.  See 42 U.S.C. § 1395ww(d).  Hospitals can obtain a variety of adjustments, however.  This case concerns the "disproportionate share hospital," or "DSH" adjustment.  The DSH adjustment is designed to provide adequate compensation to hospitals that serve a significantly disproportionate number of low-income patients.  42 U.S.C. § 1395ww(d)(5)(F)(ii).

Whether a hospital is eligible for a DSH adjustment, and the amount of the adjustment, are based on its "disproportionate patient percentage," calculated as the sum of two fractions,

which are referred to as the Medicare and Medicaid fractions. See 42 U.S.C. § 1395ww(d)(5)(F)(v) and (vi). At issue in this case is the numerator of the Medicaid fraction. The Medicare statute defines this numerator as *"the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under part A of this subchapter [i.e. Medicare Part A]."* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

Medicaid is a joint federal and state program under which the state establishes a federally-approved plan to provide medical assistance to low-income individuals. The Medicaid statute requires a state plan to include certain groups of individuals (the "categorically needy") and permits a state plan the option of including other groups (the "medically needy"). State plans must comply with the requirements of Title XIX and be approved by the Secretary. Once a state's plan is approved, the Secretary is authorized to pay the state matching funds for Medicaid expenditures. These funds are commonly referred to as Federal Financial Participation ("FFP").

Connecticut has an approved Medicaid plan. It also runs a State Administered General Assistance program ("SAGA"). Eligibility for the SAGA program is based solely on income and assets. SAGA patients are not eligible for Medicare or for

4

Connecticut's Medicaid program.  The benefits provided to SAGA patients are not identical to those provided under Medicaid.  SAGA is completely state funded.[2]

Like Medicare, Medicaid also allows DSH adjustments.  A state is given considerable discretion in determining how to calculate Medicaid DSH adjustments under its plan.  The Medicaid statute allows a state to base its DSH adjustment on services to "patients eligible for medical assistance under [an approved] State plan . . . or to low-income patients."  42 U.S.C. § 1396r-4(c)(3)(B).

Connecticut's Medicaid plan bases its DSH adjustments in part on a hospital's SAGA patient days.[3]  During the relevant period, Connecticut claimed and received FFP for DSH adjustments based on SAGA patient days.  It did not receive any other federal funds for SAGA patients.

---

[2] During the period of time at issue, the SAGA statute provided that no person eligible for Medicaid was eligible for SAGA benefits.  See 1995 Conn. Acts 351, § 8 (Reg. Sess.).  The statute was later amended to explicitly exclude from SAGA eligibility any individual eligible for Medicaid.  See 2004 Conn. Acts 258, § 9 (Reg. Sess.).  It was amended again in 2007 and may now allow some individuals to participate who also qualify as medically needy under Medicaid.  See 2007 Conn. Acts 185, § 2 (Reg. Sess.).  However, even if there is now some overlap between persons eligible for Medicaid and persons eligible for SAGA benefits, the overlap does not affect the outcome here.  Any SAGA participants also eligible for Medicaid can be counted directly in the Medicaid DSH fraction as individuals eligible for medical assistance under a state plan.

[3] The SAGA patient days serve as a proxy for low-income patient days.

The four hospitals bringing this action participate in Medicare and serve SAGA patients. All four filed Medicare cost reports for the years at issue, 1995 to 1998. Empire Medical Services ("Empire"), the plaintiffs' fiscal intermediary, issued NPRs for the relevant reporting periods without including SAGA patient days in the numerator of the Medicaid fraction. The plaintiffs appealed individually to the PRRB.[4] They then filed a request for a group appeal to the PRRB.[5]

On April 24, 2007, the PRRB held a hearing to determine whether Empire's calculation of the DSH adjustment (excluding

---

[4] Middlesex Hospital did not file an appeal for its 1995 NPR and Waterbury Hospital did not file an appeal for its 1996 NPR. Waterbury Hospital did ask Empire to reopen the NPR for 1996, but did not seek to have SAGA patient days included in its Medicare DSH calculation. Empire reopened the 1996 NPR and revised it to include additional Medicaid patient days, but not SAGA days. Waterbury Hospital subsequently appealed the revised NPR to the PRRB.
    The Board found that it did not have jurisdiction over Waterbury Hospital's appeal seeking to include SAGA patients in its Medicare DSH adjustment. Appeals of revised NPRs ("RNPRs") are limited to the specific issue for which the NPR was reopened. See Little Co. of Mary Hosp. v. Sebelius, 587 F.3d 849, 852 (7th Cir. 2009). Waterbury Hospital argues that the "specific issue" in its RNPR was the Medicaid DSH adjustment. Defendant disagrees and contends that Waterbury Hospital would have had to specifically raise the issue of SAGA days in order to appeal their exclusion. It is unnecessary to address this disagreement concerning the Board's jurisdiction because, as discussed in the text, SAGA participants are excluded from the Medicare DSH adjustment; therefore, even if the Board had jurisdiction, Waterbury Hospital could not have obtained the relief sought.

[5] The group originally included five hospitals and fourteen cost years. St. Vincent's withdrew its four cost years and Middlesex Hospital withdrew its 1994 cost year.

SAGA patient days) was proper.  On June 17, 2009, the PRRB issued its decision.  It concluded that the statutory language "medical assistance under a State plan approved under [Title XIX]" excludes days funded only by the State and charity care days, even though such days may be counted when calculating the State's Medicaid DSH adjustment.  It determined that, because SAGA beneficiaries are not eligible for Medicaid, and SAGA services are not directly matched by the federal government, SAGA patient days were properly excluded from the Medicare DSH calculation.  The CMS Administrator decided to review the PRRB's decision.  In a decision dated August 13, 2009, the Administrator affirmed the decision of the PRRB.  The decision represents the final decision of the Secretary.

II. Discussion

   Under the Administrative Procedure Act ("APA"), the Secretary's decision must be affirmed unless it is arbitrary and capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence.  42 U.S.C. § 1395oo(f)(1); 5 U.S.C. § 706(2).  The Secretary's decision is evaluated under the two-step process outlined in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  First, the Court must determine whether Congress has spoken directly to this precise question.  If so, the clear meaning of the statute controls.  If the statute is ambiguous, the Court must determine

whether the Secretary's interpretation is permissible.

The outcome in this case hinges on the meaning of the phrase "eligible for medical assistance under a State plan approved under subchapter XIX" contained in 42 U.S.C. § 1395ww(d)(5)(vi)(II).  The Medicare statute does not define "medical assistance."  The Medicaid statute, however, does define the term: under 42 U.S.C. § 1396d(a), "medical assistance" means payment of all or part of the cost of certain services to individuals eligible for Medicaid.[6]  As SAGA participants are ineligible for Medicaid, they are excluded by this definition.

Plaintiffs contend that SAGA participants are "eligible for medical assistance under a State plan" because they are included in Connecticut's Medicaid DSH adjustment calculation.[7]  The Second Circuit has not addressed the issue whether a state's inclusion of a patient population in its Medicaid DSH calculation constitutes "medical assistance under a state plan" for purposes

---

[6] The statute enumerates the covered services and lists the criteria to qualify for Medicaid.

[7] Connecticut has used its discretion under the Medicaid DSH provision to include SAGA participants as a proxy for low-income patients.  Therefore, the greater the number of SAGA patients a hospital treats, the greater the DSH payment it receives under Connecticut's Medicaid plan.  Connecticut receives matching federal funds for its Medicaid DSH payments.  As a result, hospitals indirectly receive federal funds when they serve SAGA patients.  But SAGA is separate from Connecticut's Medicaid plan, SAGA patients do not receive direct Medicaid assistance, and the benefits available to SAGA participants differ from those available to individuals covered by Connecticut's Medicaid plan.

of the Medicare DSH adjustment.  However, several courts of appeals have ruled on this issue.

Adena Regional Medical Center v. Leavitt, 527 F.3d 176 (D.C. Cir. 2008), involved essentially the same situation presented here.  Ohio's Hospital Care Assurance Program ("HCAP") provides free services to indigent patients who are ineligible for Medicaid, and Ohio includes HCAP patients in its Medicaid DSH calculations.  The Court held that "medical assistance" has the same meaning in the Medicare DSH provision as in the Medicaid statute.  See id. at 179-80.[8]  Because HCAP patients were not eligible for Medicaid, HCAP patient days were properly excluded in calculating the Medicare DSH adjustment.[9]

The Ninth Circuit reached the same conclusion in University of Washington Medical Center v. Sebelius, 634 F.3d 1029 (9th Cir. 2011).  Washington has two state-funded programs that provide medical assistance to persons ineligible for Medicaid: General

---

[8] The Court applied the general presumption that "identical words used in different parts of the same act are intended to have the same meaning."  Adena, 527 F.3d at 180 (quoting Atl. Cleaners & Dryers, Inc. v. United States, 286 U.S. 427, 433 (1932)).  It also noted that the Medicare DSH provision specifically references the Medicaid statute by referring to a state plan approved under Title XIX.

[9] Plaintiffs seek to distinguish this case on the basis of differences between Ohio's HCAP program and Connecticut's SAGA program.  In both cases, however, the state has included Medicaid-ineligible individuals in its Medicaid DSH calculations using its discretion to treat them as proxies for low income patients.

Assistance-Unemployable ("GAU") and Medically Indigent ("MI"). Washington includes both groups in its Medicaid DSH calculation. The Court ruled that these patients were not eligible for medical assistance under Washington's Medicaid plan and thus their patient days were properly excluded from the plaintiff's Medicare DSH adjustment.  The Court rejected the plaintiff's argument that because the GAU and MI patients were mentioned in Washington's Medicaid plan, and indirectly benefitted from federal Medicaid dollars through Medicaid DSH payments to hospitals, they should be deemed eligible for medical assistance under the plan.

In Cooper University Hospital v. Sibelius, 636 F.3d 44 (3d Cir. 2010), the Third Circuit affirmed a district court's grant of summary judgment against a hospital in a case involving the New Jersey Charity Care Program ("NJCCP"), which covers low-income patients who are ineligible for any private or governmental coverage, including Medicaid.  See Cooper Univ. Hosp. v. Sibelius, 686 F. Supp. 2d 483 (D.N.J. 2009).  A hospital that had been permitted to include days for NJCCP patients in its Medicare DSH calculations between 1996 and 1999 was not permitted to do so in its 2000 calculation.  The hospital sought judicial review urging that NJCPP patients should be deemed "eligible for medical assistance under a State plan" within the meaning of 42 U.S.C. § 1395ww(d)(5)(vi)(II) because they are included in the calculation of Medicaid DSH payments under the state's Medicaid

plan.  The Secretary sought summary judgment arguing that the phrase "eligible for medical assistance" means "only patients who are eligible for traditional Medicaid."  Id. at 490.  The district court concluded that the Secretary's interpretation of the statute was reasonable and thus entitled to deference under Chevron.  Id. at 497.

I agree with these courts that "eligible for medical assistance under a State plan" for purposes of the Medicare DSH provision does not include individuals who are ineligible for Medicaid but are factored into the state's Medicaid DSH calculation.  See also Covenant Health Sys. v. Sibelius, 820 F. Supp. 2d 4, 9 (D.D.C. 2011)(upholding Secretary's decision excluding patient days associated with charity care patients from providers's Medicare DSH adjustment calculation because such patients were not eligible for Medicaid); Ashtabula v. Cnty. Med. Ctr., 762 F. Supp. 2d 1, 2 (D.D.C. 2011)(same).  The Medicare and Medicaid statutes are both part of the Social Security Act and the Medicare DSH provision's description of eligibility for medical assistance specifically references Title XIX.  I therefore conclude that the definition of "medical assistance" in § 1396d(a) applies to the Medicare DSH provision.

Like the Ninth Circuit, I find strong support for this conclusion in the textual differences between the Medicare and Medicaid DSH provisions.  See Univ. of Wash. Med. Ctr., 634 F.3d

11

at 1035-36.  The Medicare provision includes in the fraction only patients eligible for medical assistance.  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (2006).  By contrast, the Medicaid provision allows states to consider either patients eligible for medical assistance or patients who qualify as low-income.  See 42 U.S.C. § 1396r-4(b)(2)-(3) (2006).

Plaintiffs have not identified any usage of "medical assistance" in the Medicare statute inconsistent with the Medicaid definition.  Indeed, the examples they cite as evidence that the Medicaid definition should not apply all relate to the Medicaid statute, under which "medical assistance" is clearly defined.

Moreover, a plain reading of the provision in question excludes SAGA participants.  Individual SAGA beneficiaries are not eligible for medical assistance under Connecticut's Medicaid plan.  They are included in the plan as an aid to determining which hospitals serve a disproportionate share of expensive patients.  To say this makes them eligible for medical assistance under the plan stretches the language too far.

Plaintiffs rely on Environmental Defense v. Duke Energy Corp., 549 U.S. 561, 574 (2007), and urge that "a given term in the same statute may take on distinct characteristics from association with distinct statutory objects."  In this case, however, there is no evidence of a different meaning.  See Cooper

Univ. Hosp. v. Sebelius, 686 F. Supp. 2d at 493 (rejecting argument that "medical assistance" has different meaning in Medicaid statute and Medicare DSH provision and finding that Congress repeatedly used "eligible for medical assistance under a State plan" as long-hand for "eligible for Medicaid").[10]

III. Conclusion

Accordingly, the defendant's motion for summary judgment (doc. 24) is hereby granted and the plaintiffs' motion for summary judgment (doc. 22) is denied.

So ordered this 29th day of September 2012.

/s/ RNC
Robert N. Chatigny
United States District Judge

---

[10] Plaintiffs also rely on Portland Adventist Medical Center v. Thompson, 399 F.3d 1091 (9th Cir. 2005). That case is inapposite because it involved an "expansion population" approved by the Secretary as part of the state's Medicaid plan. Moreover, any doubt about the Ninth Circuit's position on this issue has been eliminated by the subsequent decision in University of Washington Medical Center v. Sebelius.

13